1
2
3
4
5          IN THE UNITED STATES DISTRICT COURT
6          FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8    FRANCOIS P. GIVENS,                          No. C-07-1448 EMC (PR)
9          Petitioner,                            **ORDER DENYING PETITION
                                                  FOR WRIT OF HABEAS
10         v.                                     CORPUS AND DENYING
                                                  CERTIFICATE OF
11   MATTHEW MARTEL, Warden,                      APPEALABILITY**
12         Respondent.
13   _____/
14

## I.   INTRODUCTION

Francois P. Givens, formerly a prisoner of the State of California and now apparently on parole, filed this *pro se* action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.   The matter is now before the Court for consideration on the merits.  For the reasons discussed below, the petition will be denied.

## II.   BACKGROUND

Givens "was convicted of attempted voluntary manslaughter, infliction of corporal injury on a former cohabitant resulting in a traumatic condition, and assault with a deadly weapon" as a result of an incident on October 5, 2001, in which he "stabbed his estranged girlfriend in the course of a heated discussion." *People v. Givens*, 2006 WL 187713, *1 (Cal. Ct. App. 2006).  Several sentence enhancement allegations were found true.  On December 20, 2002, he was sentenced to eight years in state prison.

The state appellate court provided this summary of the evidence:

> Appellant was romantically involved with the victim, Leartine Swan, for about two years. The couple lived together at appellant's mother's house from July 2001 to early October 2001.  [FN2. All further references to dates are to the year

2001 unless otherwise specified. Some of the trial testimony about the events leading up to the incident refers only to days of the week, without specifying the corresponding dates. In the narrative that follows-purely for clarity, and not because the dates make a difference-we have taken judicial notice of various dates based on the calendar for October 2001. (Evid.Code, §§ 451, subd. (f); 452, subd. (h); 459, subd. (a), (c).).)]  On Tuesday October 2, appellant told Swan he had contracted a sexually transmitted disease involving "creepy crawly things," and they had an argument about it. Swan testified at trial that she was not aware of having any disease she could have communicated to appellant.

On Thursday, October 4, Swan told appellant that she would be moving in with her mother because her mother needed her. Swan went to appellant's house after work and picked up her things, and then left to spend the night at her mother's. At that point, Swan considered that she and appellant had broken up, but it is not clear from the record whether she had unequivocally communicated that to appellant.

On Friday, October 5, appellant called Swan's mother's house twice. The first time, appellant was calling from Oakland, and spoke to Swan's mother, who called him a "punk bitch." [FN3. The record is unclear as to whether Swan's mother called appellant a "punk bitch" on October 4 or during the morning on October 5, but the issue does not matter for purposes of this appeal.] According to Swan, appellant responded that "he would show [Swan's] mother what a punk bitch is," or "what a punk bitch can do." He never threatened Swan directly, however. When he called the second time, Swan could tell from the area code on her caller identification phone that he was calling from San Francisco, but she could not make out what he was saying.

Swan's mother was concerned because she realized she had said the wrong thing to appellant, so when Swan left for work later that morning, her mother advised her to carry a box cutter "just to scare [appellant] off." Swan was "kind of nervous" about appellant, so she complied, and put the box cutter in the pocket of her jacket.

At around 11:00 a.m., as Swan was walking along Beach Street toward her workplace, she saw appellant standing at a phone booth. Appellant approached her, saying "I'm going to show you what a punk bitch can do." A heated conversation ensued, lasting 10 or 15 minutes, during which appellant angrily accused Swan of lying to his mother and giving him a sexually transmitted disease. Swan told appellant that she had not been having sexual relations with anyone but him, and asked him to leave her alone and let her go to work. Appellant blocked her way, and put his hand in his jacket pocket. When Swan responded by putting her own hand in her pocket where the box cutter was, appellant asked her whether she was "fixin' to do something." According to Swan, appellant then immediately began to stab her, moving so quickly that she never had a chance to pull out her box cutter.

Swan's loud cries for help drew the attention of several passersby, one of whom pulled appellant off Swan, while another called 911 to summon the police and paramedics, and a third chased appellant away and then pressed his shirt to Swan's neck in an effort to stop the severe bleeding in her neck area. When the paramedics arrived, they cut off Swan's clothing, including her jacket, in the course of giving her emergency treatment. The box cutter was later found on top of a box in the scooter store where Swan had taken refuge from appellant's assault, but the witnesses at trial, including the investigating police officers, were unable to explain how it got there. Photographs of the box cutter taken by one of the investigating officers on the scene

2

showed it to be unopened, which was consistent with Swan's testimony.

While the passersby were helping Swan in the scooter store, appellant yelled out from across the street, saying "She had it coming. That bitch gave me AIDS," and "She deserves to die." Appellant then walked away from the scene, and some of the passersby followed him as he proceeded toward a taxi stand a few blocks away. By the time appellant reached that area, one of the passersby was able to flag down a police car and point appellant out as the assailant. The officer in the car, who had heard a police radio broadcast about the assault, drew his gun and ordered appellant to lie on the ground. The knife then fell out of appellant's pocket and was taken into evidence. As appellant was being handcuffed, he exclaimed, "The bitch had a straight razor. No she had a box cutter. [FN4. Appellant's self-defense claim was premised on the theory that Swan attacked him with the box cutter before he stabbed her. In support of this contention, appellant's trial counsel stressed that nothing in the evidence explained how appellant knew, at the time he made this remark, that Swan had been carrying a box cutter. Swan testified at trial that she neither pulled out the box cutter nor told appellant that she had it; that he could not have seen it in her pocket; and that she had never carried a box cutter with her before. When Swan was interviewed at the hospital after the assault, she failed to mention the box cutter. None of the eyewitnesses who testified at trial saw Swan wielding any weapon, but this testimony is not conclusive, because none of them saw the knife in appellant's hand either. The prosecutor argued that in mentioning the box cutter at the time of his arrest, appellant was attempting to concoct a self-defense theory, and simply made a lucky guess.] You're not going to find it. I cut the bitch. She gave me AIDS. She's my ex-girlfriend, the bitch."

Swan was taken to the hospital, where a medical examination revealed that she had suffered five knife wounds, including a life-threatening one that penetrated the left side of her neck. Extensive surgery was required to repair the wound, and Swan spent about three days in the hospital. At the time of trial, she still had visible scars on her neck and arm as a result of the assault, and she had been advised to have plastic surgery to try to reduce the neck scar. She also suffered permanent paralysis of part of the left side of her face, which interfered with the functioning of her left eye and eyelid, because appellant's knife had severed a nerve in her neck.

The information that was filed against appellant on March 11, 2002, charged him with three counts: (1) attempted first-degree murder (Pen. Code, §§ 187, 664 [FN5. All further statutory references are to the Penal Code unless otherwise specified.]); (2) infliction of corporal injury on a former cohabitant (§ 273.5, subd. (a)) (corporal injury); and (3) assault with a deadly weapon (§ 245, subd. (a)(1)) (assault). Each count also alleged enhancements for use of a deadly weapon under section 1192.7, subdivision (c)(23), and for infliction of great bodily injury under both section 12022.7, subdivision (e) (domestic violence), and section 1192.7, subdivision (c)(8) (personal infliction on a non-accomplice). The first and second counts alleged additional enhancements for use of a deadly weapon under section 12022, subdivision (b)(1).

On July 5, 2002, appellant's appointed defense counsel expressed doubts as to his client's competency to stand trial, and the proceedings were suspended pending receipt of a report on that subject. On August 2, 2002, the court found appellant competent to stand trial.

Jury selection for appellant's trial began on September 25, 2002, and the jury

3

1
2
3
4
5
6
7

> was sworn on October 1, 2002. The trial took less than two full days, and the jury deliberated for one full day and part of a second day. The jury found appellant not guilty on the attempted murder charge in count one, but found him guilty of attempted voluntary manslaughter as a lesser included offense, as well as on counts two (corporal injury) and three (assault); and returned true findings on all of the enhancement allegations.
>
> Appellant then successfully moved to exercise his right of self-representation, and filed a written motion for new trial on his own behalf. The motion for new trial was heard and denied on December 20, 2002. On the same day, appellant was sentenced to eight years in prison. He filed a timely notice of appeal on December 27, 2002.

8   Ex. 9, California Court of Appeal Opinion (hereafter "Cal. Ct. App. Op."), at 2-6 (as amended by

9   "Order Modifying Opinion and Denying Request for Rehearing," Ex. 10).[1]

10   Givens appealed. The California Court of Appeal reversed the attempted voluntary

11   manslaughter conviction on state law grounds, but otherwise affirmed the judgment. *Id.* at 6-12. The

12   California Supreme Court denied without explanation petitions for review filed by appellate counsel

13   and by petitioner pro se. Resp't Mot. to Dismiss, Ex. 3.

14   Petitioner filed his petition in this case in 2007. In response to the Court's order to show

15   cause, respondent moved to dismiss the petition as mixed. The motion was granted and Petitioner

16   was given options as to how he wished to proceed. His request that the action be stayed so that he

17   could exhaust state court remedies was granted. When he reported that he had completed

18   exhaustion, the Court lifted the stay and granted his motion to file an amended petition. That

19   petition is the operative petition in this case, the Court having denied his subsequent motions to file

20   amended petitions with inconsequential changes. Respondent has filed an answer and memorandum

21   of points and authorities in support of it, and has lodged the record with the Court. Petitioner has

22   filed a traverse and memorandum of points and authorities in support of it.[2]

23   ### III. STANDARD OF REVIEW

24   This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in

25
26   [1] Citations to "Ex." are to the exhibits lodged with the Court by the Attorney General.

27   [2] On March 14, 2011, Petitioner filed a motion for another stay to allow him to exhaust additional issues, but on March 16 he withdrew the motion.

28   4

custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

When, as is the case with some claims here, "a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011).  And it is not necessary that the state court's decision on the merits be accompanied by reasoning for § 2254(d) to be applied.  *Id.* at 784.  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  *Id.*

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  A federal habeas court

1 making the "unreasonable application" inquiry should ask whether the state court's application of

2 clearly established federal law was "objectively unreasonable." *Id.* at 409.

3      In the discussion below, the Court first considers whether Petitioner's rights were violated,

4 then applies the AEDPA standard. *See Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (AEDPA does

5 not require federal habeas court to adopt any particular methodology in deciding whether state court

6 decision is contrary to or unreasonable application of clearly established federal law); *Weighall v.*

7 *Middle*, 215 F.3d 1058, 1063 (9th Cir. 2000) (may be easier in some cases to review state court's

8 application of federal law for error and, if there was none, conclude that state-court decision was not

9 unreasonable).  Where no constitutional rights are violated, it follows *a fortiori* that no claim for

10 relief is stated under AEDPA.

11 **IV.**   <u>**DISCUSSION**</u>

12 A.    <u>Petitioner's Claims</u>

13      As grounds for relief here, Petitioner contends that: (A) his due process rights were violated

14 by the San Francisco Police Department's failure to preserve evidence and adequately investigate

15 the crime; (B) the prosecution failed to reveal exculpatory blood tests; (C) the government presented

16 false evidence to cover up a botched police investigation; (D) the prosecution knowingly presented

17 false evidence; (E) the prosecution "failed to establish a proper chain of custody" or account for how

18 "evidence was altered;" (F) there was insufficient evidence of his incompetence to stand trial; (G)

19 his Sixth Amendment speedy trial right was violated; (H) his due process rights were violated by the

20 delay in preparing the record for his direct appeal; (I) his Sixth Amendment right to an impartial jury

21 was violated by "misleading" jury questionnaires; (J) jury voir dire was improper; (K) his double

22 jeopardy rights were violated by improper jury instructions; (L) his trial counsel was ineffective in

23 several specified ways; (M) appellate counsel was ineffective in specified ways; (N) the sentencing

24 judge was biased; (O) his due process rights were violated by the California appellate court's denial

25 of his motion to recall the remittitur; and (P) section 954 of the California Penal Code is

26 unconstitutional.

27      Respondent concedes in his answer that these claims are exhausted.  Answer at 2.

28 6

1           1.     <u>Preservation of Evidence and Failure to Investigate</u>

2          This claim has two parts, first, a claim that the San Francisco police did not adequately

3    investigate the crime, and second, a claim that the police failed to preserve evidence.

4             a.     <u>Failure to Investigate</u>

5          In *Miller v. Vasquez*, 868 F.2d 1116 (9th Cir. 1989), the Ninth Circuit acknowledged the

6    clear distinction between failure to *preserve* evidence and failure to *gather* evidence, and noted that

7    there were no cases finding a due process right to have police gather exculpatory evidence.  *Miller*,

8    868 F.2d at 1119-20.  The court then held, apparently as an issue of first impression, that a bad faith

9    failure to gather evidence on the part of the police would violate due process.  *Id.* 1120-21.  *Miller*

10   has been criticized, *see White v. Tamlyn*, 961 F. Supp. 1047, 1163 n.12 (E.D. Mich.1997) (referring

11   to *Miller* as "an aberration"), but whether it was correctly decided or not is irrelevant here, because

12   the United States Supreme Court has never so held – that is, there is no "clearly established Federal

13   law, as determined by the Supreme Court of the United States," holding that failure to investigate

14   can be a due process violation.  *See* 28 U.S.C. § 2254(d) (habeas relief available only if state court

15   decision was "(1) . . . contrary to, or involved an unreasonable application of, clearly established

16   Federal law, as determined by the Supreme Court of the United States; or (2) was based on an

17   unreasonable determination of the facts in light of the evidence presented in the State court

18   proceeding.").  Thus, this claim must be rejected.

19            b.     <u>Failure to Preserve Evidence</u>

20         Petitioner contends that police violated by his due process rights by not (1) preserving an

21   unopened can of malt liquor contained in a brown paper sack; (2) photographing his broken watch

22   and a laceration on his ear; (3) documenting his "wounds;" (4) preserving blood samples taken on

23   the day of his arrest; and (5) preserving blood evidence on the knife.

24         The government has a duty to preserve material evidence, *i.e.*, evidence whose exculpatory

25   value was apparent before it was destroyed and is of such a nature that the defendant cannot obtain

26   comparable evidence by other reasonably available means.  *See California v. Trombetta*, 467 U.S.

27   479, 489 (1984); *Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997).

28
                         7

Although the good or bad faith of the police is irrelevant to the analysis when the police destroy material exculpatory evidence, the analysis is different if the evidence is only *potentially* useful:  there is no due process violation unless there is bad faith conduct by the police in failing to preserve potentially useful evidence.  *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  Negligent failure to preserve potentially useful evidence is not enough to establish bad faith and does not constitute a violation of due process.  *See Grisby*, 130 F.3d at 371.

In *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), the United States Supreme Court held that habeas "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Id.* at 1398.  That is, Petitioner cannot establish an evidentiary basis for his claims by simply making factual allegations in his filings in this Court, as is the case for several of his claims.  Most strikingly, that is the case as to his first claim, that the police dumped out his unopened can of malt liquor and threw away the can.  To support his contention that they did so, Petitioner contends only that his conduct after the assault was consistent with intoxication and that "SFPD was aware that he was drinking at the time of his arrest."  Trav. at 1-2.  Even assuming the truth of these statements, it is a huge leap from the (alleged) fact that Petitioner had been drinking and perhaps was drunk, to the conclusion that he must have had an unopened can of beer and that the police failed to preserve it.  The conclusion by no means follows.  Petitioner has failed to establish an evidentiary basis for this claim.

Petitioner's second claim under this heading is that the police failed to photograph his broken watch and a laceration on his ear.  Respondent points out that the watch was in fact photographed and booked into evidence, and Petitioner does not dispute that in his traverse.  Ex. 1, Vol. I at 53, *id.*, Vol III at 522-23, Trav. 2-3.  This part of the claim thus is frivolous.  And as to the cut on his ear, Petitioner points only to his own declaration filed in this Court as evidence that it existed; under

*Cullen*, that evidence cannot be considered because it was not before the state appellate court.[3]  *See*

*Cullen*, 131 S. Ct. at 1398.  There thus is no evidentiary basis for this claim, and it must be rejected.

Petitioner's third claim is that police failed to take him to a hospital to document his "wounds."  This claim is somewhat indistinct; in the petition he says he should have been taken to the hospital because he was at risk for stroke, but in the traverse he says that a hospital could have documented his "injuries."  Am. Pet., P. & A. at 1; Trav. at 2.  In any event, the claim is without merit both as a failure to investigate claim, because such claims cannot be the basis for habeas relief for the reasons discussed in section A(1) above, and as a preservation claim, because there is nothing in the record to show there was anything to preserve.

Petitioner also contends that the police should have preserved the blood samples they took from him when he was arrested, so the defense could have had the samples tested for alcohol and drug content.  As respondent points out, Petitioner's conviction of attempted voluntary manslaughter was reversed on appeal, and for the offenses for which he is now incarcerated, infliction of corporal injury on a former cohabitant and assault with a deadly weapon, intoxication is not a defense.  *See People v. Hood*, 1 Cal. 3d 444, 458 (1969) (assault with deadly weapon); *People v. Campbell*, 76 Cal. App. 4th 305, 308 (1999) (infliction of corporal injury on a cohabitant).  As a result he could not have been prejudiced by the failure to preserve the blood samples.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (harmless error standard for federal habeas cases is whether the trial error had substantial and injurious effect or influence in determining the jury's verdict.).

Petitioner also contends that the government failed to preserve blood on the knife he used to attack the victim.  The evidence that the knife might have been wiped is that a juror sent a note to the court saying: "The knife looks awfully clean.  When was it cleaned?"  Ex. 2, Vol 5 at 465.  On the other hand, in considering the motion for new trial, the court examined the knife and commented that it had dried blood on it.  Ex. 2, Vol. 6 at 57.  But regardless of whether the knife was or was not cleaned, in neither the petition nor the traverse does Petitioner explain what relevance the knife's

---

[3]  At the time of booking, Petitioner reported no "recent injuries" or trauma**.** Ex. 1, Vol. III at 559.

1  having been wiped, if it was, could have to his conviction.  He has failed to show any prejudice.  *See*

2  *Brecht*, 507 U.S. at 637.

3       Finally, Petitioner contends that the police did not record the "exact location where the box

4  cutter was found."  Trav. at 4.  He provides no explanation why the absence of evidence of the exact

5  location where the box cutter was found would have had an injurious effect or influence in

6  determining the jury's verdict, so even if the evidence was not preserved, Petitioner has failed to

7  show that it prejudiced him.  *See Brecht*, 507 U.S. at 637.

8       As to all of these claims, Petitioner has failed to establish that a constitutional right was

9  violated.  For that reason, the rejections of these claims by the state appellate courts could not have

10  been contrary to, or unreasonable applications of, clearly-established United States Supreme Court

11  authority.

12       2.    <u>*Brady* Claim</u>

13       Petitioner contends that the prosecution failed to disclose blood tests to the prosecution that

14  would have shown that he had been using alcohol and drugs at the time he attacked the victim.

15       In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by

16  the prosecution of evidence favorable to an accused upon request violates due process where the

17  evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

18  prosecution."  *Id.* at 87.  The Supreme Court has since made clear that the duty to disclose such

19  evidence applies even when there has been no request by the accused, *United States v. Agurs*, 427

20  U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory

21  evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985).

22       Before *Brady* can have any application, Petitioner must establish that there actually *was*

23  exculpatory evidence.  Here, there is nothing in the record to show that the government did test

24  Petitioner's blood for alcohol and drugs, and Petitioner points to no such evidence – instead, he says

25  that because they drew blood, they must have tested it for alcohol and drugs.  The record does show

26  that the blood was drawn when Petitioner was booked (he has diabetes, so a glucose test was

27  ordered), but does not contain any reference to testing for alcohol and drugs.  Ex. 1, Vol. III at 560;

28

Ex. 3, Vol. 3 at 244-45.  Petitioner thus has failed to establish the predicate for his claim, that the exculpatory evidence existed.  Because he thus has failed to establish that a constitutional right was violated, the rejections of these claims by the state appellate courts could not have been contrary to, or unreasonable applications of, clearly-established United States Supreme Court authority.

### 3.   False Testimony by Police Officers

Petitioner contends that the prosecutor knowingly presented false testimony in an effort to cover up a "botched" police investigation.

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Agurs*, 427 U.S. at 103; *see also Bagley*, 473 U.S. at 678-80.

In the petition, the only allegation of false testimony is implied by the assertion that officers Brandolino and Godfrey were allowed to hear each other's testimony, and so were able to corroborate each other "regarding the location of the victim's box cutter and other facts critical to conceal the fact that a proper investigation was not performed."  Am. Pet., P. & A. at 4.  This obviously is not sufficient to state a claim for knowing presentation of false testimony, as it does not even specify what testimony was false.  *See* Advisory Committee Notes, Rule 4, Rules Governing § 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254 ("'[N]otice' pleading is not sufficient, for the petition is expected to state facts that point to a 'real possibility of constitutional error.'") (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970)).

Only in his traverse does Petitioner provide specific allegations.  Trav. at 6-7.  A traverse is not the proper pleading to raise additional grounds for relief, however.  *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).  As was the case in *Cacoperdo*, Petitioner's having presented these factual allegations only in his traverse means that the Respondent did not have notice of the allegations at the time the answer was filed and was denied an opportunity to respond to them.  The claims will be rejected as improperly raised.

Alternatively, the claims have no merit.  In the traverse Petitioner contends that officer Brandolino lied about not having been the person who took custody of a box cutter and a shirt and

about not seeing the box cutter on the ground, that officer Godfrey lied when she testified that she arrived on the scene after officer Merino, that Godfrey lied about who cut off the victim's clothing and when, that officer Rowland "suppressed" the fact that officer Hambay cut off the victim's clothing, and that Rowland lied when he said that there were no witnesses who could testify that Petitioner was drunk at the time of the assault.  Trav. at 6-7.

Petitioner does not explain why he thinks that any of these purported lies mattered to the result, and it does not appear that they did.  Petitioner's counsel impeached Brandolino with the police report, which stated that it was Brandolino who bagged the items.  Ex. 2, Vol 4 at 359.  As a result, the fact that it was Brandolino who took possession of the evidence was before the jury.  The order in which officers arrived at the scene has no obvious relevance, nor does which officer cut off the victim's clothing.  And whether Petitioner was drunk at the time was irrelevant to the offenses for which he is now serving his sentence, because as discussed above, under California law intoxication is not a defense to them.  In short, even assuming that Petitioner's allegations are correct, there is no reasonable likelihood the purported false testimony affected the verdict.  *See Agurs*, 427 U.S. at 103.  Petitioner thus has failed to establish that a constitutional right was violated.  For that reason, the rejections of these claims by the state appellate courts could not have been contrary to, or unreasonable applications of, clearly-established United States Supreme Court authority.

4.     <u>False Testimony by Victim</u>

Petitioner also claims that the prosecution presented false testimony from the victim.  He points out that she initially said that the box cutter was in the right pocket of her jacket, Ex. 2, Vol. 4 at 386, then at first on cross-examination that it was the outside right pocket, *id.* at 404-05, and later in the cross-examination that it was in an inside pocket, *id.* at 426-27.  Pet. at 5-6.  The testimony was:

Q.  [by defense counsel]  And do you remember which pocket you told us it was in?

A.  It was on the right side.  It was.  It was on the right side.

Q.  On the inside or the outside?

12

1   A  Inside.

2   Q.  Inside –

3   A.  Inside the right pocket.

4   Q.  – pocket.  Now, could you show us on the jacket where that pocket is.

5   A.  It was in this area.  It's not here.

6   Q.  No pocket.

7   Ex. 2, Vol. 5 at 427.  The prosecution, on redirect, established that the paramedics had cut off her

8   clothing.  *Id.* at 428.  In ruling on the motion for new trial, the trial court said:  "[O]n direct she

9   testified that the box cutter was in one pocket and when we actually got the coat here, her testimony

10  changed and it was in the other pocket.  But the jury had that information before them, as well."  *Id.*,

11  Vol. 6 at 29.

12      The only evidence Petitioner presents that the victim's testimony was false is that set out

13  above.  It is open to question whether the testimony actually was contradictory, but even if it was,

14  the contradiction was before the jury, which could evaluate its truthfulness or lack of it.  Thus, even

15  assuming that the testimony was false, there was no reasonable likelihood that it affected the verdict.

16  There thus was no violation of a constitutional right, and for that reason, the rejections of this claim

17  by the state appellate courts could not have been contrary to, or unreasonable applications of,

18  clearly-established United States Supreme Court authority.

19      5.   Alteration of Evidence

20      Petitioner contends that the prosecution tampered with the evidence by wiping blood off the

21  knife and the box cutter.  Petitioner frames this as a *Brady* claim, presumably because the blood on

22  the knife and the box cutter – if there was any on the box cutter – was not turned over.  But it

23  actually is a *Trombetta/Youngblood* claim, as discussed in section A, above, because it involves

24  failure to preserve evidence.

25      There is no evidence that there ever was any blood on the box cutter, so that claim fails.  As

26  to the knife, this claim was rejected in section A, above, and is rejected again here for the same

27  reasons.  Because petitioner has failed to establish that a constitutional right was violated, the

28                                              13

1   rejections of this claim by the state appellate courts could not have been contrary to, or unreasonable

2   applications of, clearly-established United States Supreme Court authority.

3         6.    <u>Competence to Stand Trial</u>

4         Petitioner contends that the trial court should not have ordered a competency evaluation

5   when his counsel declared a doubt about his competency.  His argument is that under California law,

6   counsel's mere declaration of doubt, without a statement of specific reasons supporting that doubt, is

7   not sufficient to trigger an evaluation.  Trav. at 9.  This is a state law claim, and thus cannot be the

8   basis for federal habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas

9   unavailable for violations of state law or for alleged error in the interpretation or application of state

10  law).[4]

11        7.    <u>Speedy Trial</u>

12        Petitioner contends that the delay in bringing him to trial violated his federal speedy trial

13  rights.

14        A speedy trial is a fundamental right guaranteed to the accused by the Sixth Amendment to

15  the Constitution and imposed by the Due Process Clause of the Fourteenth Amendment on the states.

16  *Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967).  No per se rule has been devised to determine

17  whether the right to a speedy trial has been violated.  Instead, courts must apply a flexible

18  "functional analysis," *Barker v. Wingo*, 407 U.S. 514, 522 (1972), and consider and weigh the

19  following factors in evaluating a Sixth Amendment speedy trial claim: (1) length of the delay; (2)

20  the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant.

21  *Doggett v. United States*, 505 U.S. 647, 651 (1992); *Barker*, 407 U.S. at 530; *United States v. Lam*,

22  251 F.3d 852, 855 (9th Cir.), *amended*, 262 F.3d 1033 (9th Cir. 2001).

23        Here, the time between arraignment on March 12, 2002, and commencement of trial on

24

25        [4]  The Court notes that any error in ordering the evaluation also was harmless.  The
   doctors who evaluated him concluded that Petitioner was competent to stand trial, and he
26  was tried and convicted.  Any error could not have had a "substantial and injurious effect or
   influence in determining the jury's verdict."  *See Brecht v. Abrahamson*, 507 U.S. 619, 638
27  (1993).

28                                  14

September 25, 2002, was approximately six months.  The length of the delay is to some extent a triggering mechanism.  Unless it is long enough to be considered "presumptively prejudicial," there is no necessity for inquiry into the other factors.  *Doggett*, 505 U.S. at 651-52.  Depending on the nature of the charges, the lower courts have generally found post-accusation delay presumptively prejudicial at least as it approaches one year.  *Id.* at 652 n.1.  The Ninth Circuit, however, has said that a six-month delay is a "'borderline case,'" and that "there is a general consensus among the courts of appeals that eight months constitutes the threshold minimum."  *United States v. Gregory*, 322 F.3d 1157, 1162 n.3 (9th Cir. 2003).  In light of this, the delay was not presumptively prejudicial, and the inquiry need go no further.

Alternatively, the Court will consider the *Barker* factors.  The Ninth Circuit considers the second factor, *i.e.*, the reason for the delay, to be the "focal inquiry."  *United States v. King*, 483 F.3d 969, 976 (9th Cir. 2007).  Here, Petitioner waived time on April 9, 2002, and did not withdraw the waiver until June 21, 2002, a period of over two months.  Ex. 1, Vol. I at 104, 129.  Then defense counsel declared a doubt about Petitioner's competency, resulting in another month of delay.  That is, three months of the six month delay clearly were not chargeable to the prosecution.  Given that the delay thus was only three months and that six-month delay already was less than the threshold for presumptive prejudice, this factor does not weigh in favor of Petitioner.

The second factor is the reason for the delay.  Respondent contends that the remainder of the delay was caused by the withdrawal of Petitioner's first appointed lawyer and the time needed for the second lawyer to prepare.  Petitioner does not dispute this, but contends that because the lawyers were appointed, the delay is attributable to the prosecution.  He is incorrect.  Delays requested by appointed defense counsel are chargeable to the defendant.  *See Vermont v. Brillon*, 129 S. Ct. 1283, 1290 (2009) (rule that delays requested by defense counsel are chargeable to the defendant "applies whether counsel is privately retained or publicly assigned.").  This factor does not favor Petitioner.

The third factor is the defendant's assertion of his right.  Assuming that the only waiver was from April 9, 2002, through June 21, 2002, this factor is either neutral, *Gregory*, 322 F.3d at 1162, or at most "slightly[] in the defendant's favor," *id.* at n.4.

15

1        The fourth factor is prejudice.  Petitioner contends that the delay resulted in a number of

2   named witnesses not being available at trial, but he provides not even allegations as to what those

3   witnesses would have said or why their testimony would have been helpful to him.  On this record,

4   there was no prejudice.

5        Of the factors, three weigh against Petitioner, and one slightly in his favor.  There was no

6   speedy trial violation.  Because there was no constitutional error, the rejections of this claim by the

7   state appellate courts could not have been contrary to, or unreasonable applications of, clearly-

8   established United States Supreme Court authority.

9        8.   <u>Delay in Preparing Appellate Record</u>

10        It took nearly two and half years to get the appellate record completed and filed in the

11   California Court of Appeal.  Petitioner contends that this delay was a violation of his due process

12   rights.

13        This claim was raised on direct appeal.  Cal. Ct. App. Op. 20-22.  Petitioner argued there that

14   if his conviction were reversed in whole or in part, the delay on appeal should bar retrial.  *Id.* at 20.

15        The court of appeal noted that the parties "agree that the controlling authority on this issue is

16   *Barker v. Wingo*," discussed in the section immediately above.  *Id.*.  It then applied the four factor

17   test described above.  *Id.* at 20-21.  It concluded that three of the factors favored Petitioner  *Id.* at 20.

18   As to the fourth, prejudice, the court said:

19          As to the fourth factor, however, it would be premature for us to reach the
    issue.  If the prosecutor were to decide for any reason not to retry appellant on the

20          attempted voluntary manslaughter charge, appellant will not have suffered any
    prejudice from the delay,[5] and the issue will be moot. (*See In re Christopher S.* (1992)

21          10 Cal. App. 4th 1337, 1341 [delay on appeal not prejudicial where convictions
    affirmed]; *People v. Sylvia* (1960) 54 Cal. 2d 115, 125 [same].) If the prosecutor does

22

23        [5] [FN17.]  Appellant has been in custody since his arrest on October 5, 2001.
    According to the July 29 abstract of judgment, he has been sentenced to a total of eight years

24   in prison, consisting of three-year concurrent sentences on each count, and a total of five
    years for the enhancements. We have affirmed appellant's convictions for corporal injury

25   and assault, including the enhancements. Even if appellant is not retried on the attempted
    voluntary manslaughter charge, it appears that his sentence for the counts we have affirmed

26   will equal or exceed the time he will have been in custody by the time he is resentenced,
    even taking applicable credits into account.  (Footnote in original but renumbered.)

27

28             16

1  decide to retry appellant, the determination whether appellant has been prejudiced by
   the delay will depend on facts not discernible from the current appellate record,
2  including the availability of witnesses and evidence, the fading of memories, and
   other factors. Accordingly, if the prosecutor seeks to retry appellant, we leave it to the
3  trial court on remand to conduct appropriate proceedings to determine whether or not
   the delay has prejudiced appellant to an extent that bars his retrial.

4

5  *Id.* at 21.  Petitioner was not retried, and thus there was no prejudice.

6       Petitioner's claim is without merit for another reason.  Although the parties agreed on direct

7  appeal that *Barker*'s four factor test was controlling, they were wrong.  The Ninth Circuit has

8  recently held that although some circuit courts of appeals have extended the *Barker* speedy trial

9  analysis to appeals, the United States Supreme Court has not.  *Hayes v. Ayers*, 632 F.3d 500, 523

10  (9th Cir. 2011).  Under the AEDPA, habeas relief can be granted on a legal claim only if the state

11  court decision is contrary to, or unreasonable applications of, clearly established Supreme Court

12  authority.  28 U.S.C. § 2254(d)(1).  Consequently when as here there is no clearly established

13  Supreme Court authority, there can be no habeas relief.  *Hayes*, 632 F.3d at 523.

14       9.      Jury Questionnaires

15       Petitioner contends that the wording of the jury questionnaire violated his rights.  The

16  questionnaire said that the case involved "an allegation that the defendant assaulted another person

17  with a knife."  Ex. 1, Vol. II at 195.  This language was worked out by the prosecutor and defense

18  counsel after the court had suggested that the prospective jurors be given a "condensed form . . .

19  summary of the charges" at the beginning of the questionnaire.  Ex. 2, Vol. 1 at 15.  Both the

20  prosecutor and defense counsel accepted the revised questionnaire. *Id.* at 24.  On voir dire, several of

21  the prospective jurors expressed concern about sitting on a case with such a serious charge as

22  attempted murder.  *See*, *e.g.*, Ex. 2, Vol. 3 at 117; *id.* at 145; *id.* at 181.

23       The Sixth Amendment guarantees defendants a right to an impartial jury.  *United States v.*

24  *Martinez-Salazar*, 528 U.S. 304, 311 (2000).  But even if it is assumed that the accurate statement in

25  the questionnaire somehow was misleading, there is no reason to believe that the inaccuracy would

26  have biased the jury, and Petitioner provides no explanation why he thinks that it did.

27       Because Petitioner has failed to show constitutional error, the rejections of this claim by the

28                                                    17

state appellate courts could not have been contrary to, or unreasonable applications of, clearly-established United States Supreme Court authority.

10. Voir Dire

Petitioner contends that one prospective juror said in voir dire that there was no reason she could not be a juror and that she could be fair, but in her questionnaire said that she would sympathize with the victim and had biased feeling about blacks (Petitioner is black). Ex. 2, Vol. 3 at 210, 212, 221. Petitioner claims that he was forced to use a peremptory strike to remove her and thus had one fewer peremptory strike available to ensure an unbiased jury, which he contends violated his Sixth Amendment and due process rights. The Supreme Court has held that the loss of a peremptory because of a trial court's failure to excuse a biased juror does not violate either the Sixth Amendment or due process. *See Martinez-Salazar*, 528 U.S. at 314-16 (due process); *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) (Sixth Amendment).

Because Petitioner has failed to show constitutional error, the rejections of this claim by the state appellate courts could not have been contrary to, or unreasonable applications of, clearly-established United States Supreme Court authority.

11. Double Jeopardy

Petitioner contends that the offenses of infliction of corporal injury on a cohabitant and assault with a deadly weapon are lesser included offenses of attempted voluntary manslaughter, and that his conviction of all three offenses thus violated his right to be free from double jeopardy. Because his conviction of attempted voluntary manslaughter was reversed on appeal and he was not retried on that charge, the argument is moot as to whether the two lesser offenses are included in attempted voluntary manslaughter, but the question remains whether assault with a deadly weapon is a lesser included offense of infliction of corporal injury on a cohabitant.

This claim was raised on direct appeal. The California Court of Appeal noted that it is clear that assault with a deadly weapon is not a lesser included offense of infliction of corporal injury on a cohabitant if only the elements of the statutory offenses are considered, as "it is self-evident that each of these crimes includes an element not present in the other: corporal injury resulting in a

traumatic condition may be inflicted on a former cohabitant without the use of a deadly weapon, and conversely, an assault with a deadly weapon may be committed upon someone who is not a former cohabitant, and need not result either in corporal injury or in a traumatic condition."  Cal. Ct. App. Op. at 16.  Petitioner's argument, however, was that if the enhancement allegations – that he used a deadly weapon and that he inflicted great bodily injury – are considered, the assault indeed was a lesser included offense of the corporal injury charge.  *Id.* at 15.  The court of appeal held that under California law the enhancement allegations cannot be considered, and thus rejected the claim.  *Id.* at 16-17.  The California Supreme Court has since agreed.  *See People v. Sloan*, 42 Cal. 4th 110, 115-20 (2007).

The Fifth Amendment guarantee against double jeopardy consists of three separate constitutional protections: (1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense.  *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969).  Here it is clear that Petitioner was not subjected to a second prosecution after an acquittal or conviction, so the claim turns on whether he was subjected to multiple punishments for the same offense.

In contrast to the double jeopardy protection against successive prosecutions, the other component of double jeopardy – protection against multiple punishments – is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature.  *Garrett v. United States*, 471 U.S. 773, 793 (1985); *Ohio v. Johnson*, 467 U.S. 493, 499 (1984); *Brown v. Ohio*, 432 U.S. 161, 165 (1977).  Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, the question under the Double Jeopardy Clause whether punishments are "multiple" is essentially one of legislative intent.  *See Missouri v. Hunter*, 459 U.S. 359, 366-68 (1983).  When the legislature intends to impose multiple punishments, as for example in a sentence enhancement for use of a firearm in the crime, there is no double jeopardy.  *Plascencia v. Alameida*, 467 F.3d 1190, 1204 (9th Cir. 2006) (California Penal Code § 12022.53 does not offend double jeopardy principles).

A determination by a state's highest court that the legislature intended to permit multiple punishments is binding in federal court. *Hunter*, 459 U.S. at 368. In *People v. Sloan*, 42 Cal. 4th 110 (2007), the California Supreme Court, in considering a claim that involved the federal double jeopardy bar on multiple punishments, held that the California legislature separately defined the offenses involved, separately prescribed an enhancement, and made clear in section 954 of the California Penal Code that a person can be convicted of more than one crime arising out of the same act or course of conduct. This established that the legislature authorized cumulative punishment. *Id.* at 121. There thus was no double jeopardy violation.

Because Petitioner has failed to show constitutional error, the rejections of this claim by the state appellate courts could not have been contrary to, or unreasonable applications of, clearly-established United States Supreme Court authority.

### 12. Ineffective Assistance of Trial Counsel

The Sixth Amendment to the United States Constitution guarantees a defendant the right to effective assistance of counsel in a criminal prosecution. *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970). In the landmark case of *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth the standard, a two-pronged test, for evaluating claims for ineffective assistance of counsel. First, Petitioner must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *id.* at 687–88, "not whether it deviated from best practices or most common custom," *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Strickland*, 466 U.S. at 650). Judicial scrutiny of counsel's performance must be highly deferential: "[a] court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689).

*Strickland*'s second prong requires a showing "that counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To establish prejudice under *Strickland*, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

20

A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694-95.

If a Petitioner cannot establish that defense counsel's performance was deficient, it is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test. *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, if a Petitioner cannot show prejudice, the Court may presume deficient performance and resolve the claim on the prejudice prong. *See id* at 697 (court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies); *Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (applauding district court's refusal to consider whether counsel's conduct was deficient after determining that Petitioner could not establish prejudice).

When considering an ineffective assistance claim in a habeas case, federal courts must apply a "doubly" deferential standard. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1410-11 (2011); *Harrington*, 131 S. Ct. at 788; *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

Petitioner contends that his trial counsel was ineffective in five specified ways.[6]

a.  <u>Failure to Investigate Self-defense</u>

Petitioner contends that his trial counsel was ineffective in failing to adequately investigate the possibility of claiming that Petitioner acted in self-defense. Habeas "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 131 S. Ct. at 1398. Petitioner raised this claim in his motion for new trial in state court and the state court held a hearing on the motion. *See* Ex. 2, Vol. 6 (RT 12/20/02) at 6-72. The only

---

[6] Because the same standard applies to these claims, they all will be discussed here, rather than in separate sections as Petitioner presents them in the petition.

1   evidence that was taken at the hearing, however, was from a police officer, whose testimony was

2   without value because of his inability to remember the events of the case.  *Id.* at 18-25.  There

3   therefore is no evidence in the record whether counsel did or did not do the investigation that

4   Petitioner thinks he should have.  That in itself is sufficient to establish that this claim is without

5   merit.

6          Furthermore, even if it is assumed that counsel in fact did not do the things Petitioner says he

7   should have, the lack of a supporting record as to what would have been uncovered by a more

8   extensive investigation eviscerates Petitioner's claims.  For instance, he contends that counsel

9   should have had the victim's box cutter tested for blood, but the trial judge stated that he had seen no

10  blood on the box cutter at trial, and reexamined it at the hearing on the motion for new trial and said

11  that he still could not detect any.  *Id.* at 35, 57.  In the absence of any evidence that there was blood

12  to test, much less what such tests would have revealed, Petitioner cannot show that the failure to test

13  the box cutter caused him any prejudice.  As another example, Petitioner contends that witness

14  Lamposa's shirt should have been tested for Petitioner's blood, his theory being that Lamposa, a

15  complete stranger, used the shirt to attempt to conceal the box cutter.  Pet. at 18.  But in the absence

16  of any evidence in the record of what an analysis of any blood on the shirt would have shown,

17  Petitioner cannot show prejudice.  Similar reasoning applies to Petitioner's claim that counsel should

18  have had the box cutter fingerprinted – there is no evidence that there were any fingerprints on it.  It

19  also applies to his claim that counsel should have interviewed an "elderly Asian man" who he says

20  was a witness – there is no record who that person was or what he would have said.

21         Petitioner's claim that his counsel was ineffective in failing to investigate a self-defense

22  defense is without merit.

23             b.    <u>Failure to Investigate an Intoxication Defense</u>

24         As discussed in section A(2) above, under California law the attempted voluntary

25  manslaughter charge was the only one of the offenses of which Petitioner was convicted to which

26  intoxication is a defense.  Because Petitioner's conviction on that charge was reversed, he could not

27  have been prejudiced by any failure on the part of counsel to investigate the possibility of using that

28                                                22

1    defense.

2                    c.       Failure to Call Witnesses

3         Petitioner contends that counsel was ineffective in failing to call nine witnesses.

4         As to witness Robert Lamposa, the only thing in the record that indicates what his testimony

5    might have been is his statement given to a defense investigator.  It was attached as an exhibit to

6    Petitioner's motion for a new trial.  Ex. 6, Vol. III at 624-25.  Lamposa said at the outset:  "I hate

7    that son a bitch.  I hope he rots in prison . . . I'm not going to say anything to help him, you don't

8    want me was a witness."  *Id.* at 624.  Lamposa then calmed down, however, and described events –

9    he pulled Petitioner off Swan, saw the knife Petitioner was holding pull out of Swan's neck, and

10   fended off an attempt by Petitioner to renew the assault.  *Id.* at 624-25.  He did not see a box cutter

11   at the scene.  *Id.* at 625.  It is apparent from this that counsel's failure to call Lamposa as a witness

12   was neither deficient performance nor prejudicial.

13        Petitioner says that witness Timothy Hamby, a physician visiting from Atlanta who rendered

14   emergency aid, could have testified about the box cutter.  There is no evidence in the record as to

15   what he would have said if called.

16        Sonya Mount was the witness who called 911.  There is nothing in the record as to what she

17   might have said if called.

18        Ashley Conroy also called 911.  Petitioner speculates that she might have seen the box cutter

19   in Swan's hand, and could have testified that she heard Petitioner say that Swan had a box cutter, but

20   there is nothing in the record to support this speculation.

21        Petitioner does not identify any testimony that witness Stacey Anne Carlson could have

22   provided that would have been helpful to him.

23        Officer Stewart Ng was one of the officers who participated in the arrest of Petitioner.  Ng

24   had been on the prosecution's witness list; when the prosecutor decided not to call him, defense

25   counsel subpoenaed him.  Ng was on vacation, however, and could not be served.  Consequently, the

26   parties stipulated to what Ng's testimony would have been if he had appeared.  Ex. 2, Vol. V at 474-

27   76. Petitioner contends that counsel was ineffective in not obtaining Ng's live testimony because

28                                                  23

when Ng testified at the preliminary hearing, he quoted Petitioner as saying that Swan "had actually cut him with a box cutter," and the stipulation did not include this point. Am. Pet., P. & A. at 21. Petitioner errs in saying that the stipulation did not include this point, however. Part of the stipulated testimony read into the record was "[t]he suspect was yelling out loud while lying on the ground, quote, "The bitch had a straight razor. No, she had a box cutter. You're not going to find it. I cut the bitch. She gave me AIDS. She's my ex-girl, the bitch," end quote." Ex. 2, Vol 5 at 437. Because the evidence included the reference to a box cutter, the evidence that Petitioner contends Ng could have given if called, defense counsel's performance in not obtaining Ng's live testimony was not deficient performance, nor was Petitioner prejudiced by Ng's absence.

Officer Robert Merino's report says that he and two other officers found the box cutter on the floor, and one of the other officers photographed it on the floor. Ex. 1, Vol. III at 525. The officer who took the photo testified that he photographed the box cutter on top of a box and never saw it on the floor. *Id.,* Vol. 4 at 358, 361. Petitioner contends that if he had been called, Merino could have contradicted that testimony. It does appear that might be true, but the usefulness of doing so would be slight. No one denied that Swan had the box cutter, and that it was found at the scene. Petitioner does not explain why it matters whether it was on the floor or on a box. He has failed to establish that failure to call Merino caused him any prejudice.

Petitioner says that counsel should have called Inspector Richard Quesada. Quesada testified at the preliminary hearing that Petitioner told him in an interview that Swan had attacked him. As respondent points out, Petitioner also told Quesada that he "lost it" with Swan and falsely claimed that she had given him AIDS, both facts that would support his guilt of the most serious charge, attempted voluntary manslaughter. Ex. 1, Vol. I at 86-87 (transcript of preliminary hearing). Competent counsel could conclude that calling Quesada was unwise. Petitioner thus has failed to overcome the "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 131 S.Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 689).

Finally, Petitioner contends that counsel was ineffective in failing to put Petitioner on the

24

stand.  But Petitioner stated in open court that he had been given adequate time to decide whether to take the stand, and that he was voluntarily waiving that right.  Ex. 2, Vol 5 at 471-72.  Petitioner contends that he was forced into this position because his attorney was untrustworthy, but as the discussion of his ineffective assistance claims in this order shows, counsel was competent and was not untrustworthy.  And in any event, the decision to call or not call the Petitioner to testify is generally a tactical or strategic one.  *See United States v. Joelson*, 7 F.3d 174, 177-78 (9th Cir. 1993) (characterizing decision as "tactical" and "strategic").  Petitioner has failed to overcome the presumption of effective assistance as to this claim.

### d.   Communication Between Counsel and Client

Petitioner contends that counsel did not "adequately" communicate with him.

A criminal defendant who cannot afford to retain counsel has no right to an attorney who likes and feels comfortable with him. *United States v. Schaff*, 948 F.2d 501, 505 (9th Cir. 1991). The Sixth Amendment does not guarantee a "meaningful relationship" between an accused and his counsel; it only guarantees effective representation of counsel.  *Morris v. Slappy*, 461 U.S. 1, 14 (1983).  Here, although Petitioner lists several occasions on which counsel did not provide him with the documents he wanted and describes incidents of conflict between them, he does not show how the allegedly inadequate communication caused counsel's representation of him to be deficient.  He thus has failed to carry his burden to show that counsel's performance was deficient and that any such deficiency prejudiced him

### e.   Prior Misconduct

Petitioner contends that counsel was ineffective in asking the victim questions that opened the door for the prosecutor to ask about prior violent incidents between them.  This claim was raised on direct appeal.  The California Court of Appeal set out the background:

> Prior to trial, the judge ruled that the prosecution could not introduce evidence of a prior incident of domestic violence by appellant against Swan under Evidence Code section 1109, but left that ruling open for reconsideration if the trial evidence so warranted. The judge later explained that he had made this ruling under Evidence Code section 352 because the prior incident was "tangential" to the incident giving rise to the current assault.

In cross-examining Swan at trial, appellant's counsel elicited her testimony that during their relationship, she and appellant had generally gotten along well, and that although they had had their differences and arguments as most couples do, appellant had generally been a "nice man" when they were not arguing. He also elicited testimony that prior to the assault, appellant and Swan "had never had an altercation like that before" and that they had never "ended up with weapons" before.

At an ensuing bench conference, which was summarized on the record in the jury's absence shortly thereafter, the prosecutor renewed his request to be allowed to introduce the prior domestic violence incident. The trial judge granted the request, reasoning that the evidence had become admissible under Evidence Code section 1109 because "there were quite a number of questions asked about the prior relationship of the parties, and particularly questions that went to whether there had ever been violence between the two individuals, and she answered those questions no." The judge explained that "I did not think that in light of the questions asked that my concerns about [Evidence Code section] 352 were applicable any further."

As permitted by this ruling, during his redirect examination of Swan, the prosecutor elicited her testimony that appellant once pushed her onto a bed and was about to hit her with a bottle, but was prevented from doing so by his mother. Appellant had also ripped off Swan's shirt on a couple of other occasions, but he apologized, and Swan stayed with him because she cared about him. The prosecutor referred to this evidence in his closing argument as tending to undercut appellant's claim that he had acted in self-defense.

Appellant now argues that his trial counsel rendered ineffective assistance because, by eliciting Swan's testimony that the couple got along well, he effectively opened the door for the introduction of the evidence regarding appellant's prior violence against Swan, thus undercutting appellant's contention that he acted in self-defense when he stabbed Swan.

Cal. Ct. App. Op. at 17-18.

In rejecting the claim, the court said:

To prevail on an ineffective assistance of counsel claim, the defendant must demonstrate both (1) that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) that there is a reasonable probability that the verdict would have been more favorable to the defendant if counsel's performance had not fallen below the applicable standard. *(Strickland v. Washington* (1984) 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *People v. Weaver* (2001) 26 Cal.4th 876, 925, 111 Cal.Rptr.2d 2, 29 P.3d 103.) When a claim of ineffective assistance of counsel is raised on direct appeal, the conviction will be reversed only if the record affirmatively discloses that counsel had no rational tactical purpose for the challenged act or omission. (*People v. Fosselman* (1983) 33 Cal.3d 572, 581, 189 Cal.Rptr. 855, 659 P.2d 1144.) Reviewing courts defer to trial counsel's reasonable tactical decisions, and "should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight. [Citation.]" (*People v. Scott*, supra, 15 Cal.4th at p. 1212, 65 Cal.Rptr.2d 240, 939 P.2d 354; *see People v. Jones* (2003) 29 Cal.4th 1229, 1254, 131 Cal.Rptr.2d 468, 64 P.3d 762; *People v. Garvin* (2003) 110 Cal.App.4th 484, 490, 1 Cal.Rptr.3d 774.)

In the present case, in assessing whether appellant's trial counsel had a tactical reason for examining Swan on the subject of the couple's history with respect to domestic violence, we have the benefit of the colloquy between appellant's counsel and the court that was put on the record during the recess. As appellant's counsel explained at that time, he asked the questions in order to bolster appellant's self-defense theory by establishing that appellant did not have an extensive or escalating history of domestic violence. He admittedly knew that this line of questioning posed a risk of making the prior violence evidence admissible, but he averred that he had tried to keep the questions tangential enough to avoid this, and argued that he had succeeded, although the trial judge ultimately ruled otherwise. In light of the scantiness of the other evidence supporting appellant's self-defense claim,[footnote omitted] and the relatively mild nature of the incidents counsel risked admitting by establishing that the couple's prior history was largely peaceful, we cannot characterize this decision as falling below the applicable standard of reasonable competence.

Moreover, we cannot find it reasonably probable that the jury verdict would have been different if the prior domestic violence evidence had not been introduced. The evidence that appellant stabbed and seriously injured Swan was overwhelming, and appellant does not contend otherwise. The only real factual questions were (1) whether appellant acted with malice; (2) whether appellant intended to kill Swan; and (3) whether appellant acted in self-defense. The first of these was resolved in appellant's favor by the jury when it found him not guilty of attempted murder. The second issue has been rendered immaterial by our reversal of the attempted manslaughter conviction, as intent to kill is not an element of either of the other counts of which appellant was convicted. As to the third issue, in light of the overall state of the evidence at trial, we find it extremely unlikely that the evidence of appellant's previous behavior toward Swan could have played a material role in the jury's decision to reject appellant's self-defense claim.

For all of the foregoing reasons, we do not find anything in appellant's claim of ineffective assistance of counsel on his direct appeal that requires us to reverse his convictions for corporal injury or assault.

Cal. Ct. App. Op. at 18-20.

Counsel attempted to avoid opening the door to admission of evidence of the prior domestic violence by asking about prior conduct with weapons, the prior violence not having involved weapons. Ex. 2, Vol. 4 at 415. This did not work, but clearly he did have a tactical reason for doing as he did; he hoped to get the witness to give the jury the erroneous impression that there had been no prior abuse, without opening the door to the prosecution's counterattack. Counsel's questions were based on a reasonable tactical calculation and thus did not constitute ineffective assistance. *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984) (tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available).

Alternatively, when considering an ineffective assistance claim in a habeas case, federal courts must apply a "doubly" deferential standard. *See Cullen*, 131 S. Ct. at 1410-11; *Harrington*, 131 S. Ct. at 788; *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788. At a minimum, the California Court of Appeal's holding on this point was not unreasonable.

    f.    <u>Failure to Object to Jury Instructions and Request a Jury Instruction</u>

Petitioner contends the counsel was ineffective in failing to object to the trial court's jury instructions CALJIC 8.40, 8.72, and 17.10.

As to CALJIC 8.40, the California Court of Appeal considered whether the instruction as given was erroneous, despite the lack of objection. The court concluded that it was and reversed Petitioner's conviction for attempted voluntary manslaughter. Cal. Ct. App. Op. at 8-12. Counsel's failure to object to it thus was harmless.

The other instructions to which Petitioner claims counsel should have objected are CALJIC 8.72 and 17.10, both of which relate to lesser included offenses. He contends that these instructions led the jury to believe that the only lesser included offense of attempted murder was attempted voluntary manslaughter, of which he was convicted. Am. Pet. at 25-26. Because Petitioner's conviction of the lesser offense was reversed and he was not retried, counsel's failure to object to these instructions could not have prejudiced him.

Petitioner also contends that counsel should have requested CALJIC 17.03, which instructs the jury about alternative counts arising from the same acts, and which he contends would, if it had been given, have prevented him from being convicted on both the lesser included offense of attempted manslaughter on count one and assault with a deadly weapon on count three. His conviction on count one was, however, reversed, so failure to request the instruction could not have been prejudicial.

g.      Summary

Petitioner has failed to establish that his counsel was ineffective in any of the ways discussed above.   The rejections of these claims by the state appellate courts thus could not have been contrary to, or unreasonable applications of, clearly-established United States Supreme Court authority.

13.    Ineffective Assistance of Appellate Counsel

Petitioner contends that his appellate counsel was ineffective in several ways.

Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984), set out in the section above.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller v. Keeney*, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989).  Weeding out weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  *Id.* at 1434.  Appellate counsel therefore will frequently **satisfy** an objective standard of competence and cause the client no prejudice because he or she declined to raise a weak issue.  *Id.*

a.      Failure to Argue that the Error in the Attempted Voluntary Manslaughter Instruction Required Reversal of All Convictions

Petitioner contends that his appellate counsel was ineffective in not contending that the error in the attempted voluntary manslaughter instruction – the error that caused the court of appeal to reverse that part of the verdict – "affected the outcome of the entire jury verdict."  Am. Pet. P. & A. at 27.  He contends that under California law, assault with a deadly weapon, of which he was convicted, is a lesser included offense of attempted voluntary manslaughter, so "a defendant cannot convicted of both . . . ."  Am Pet. at 28.  His argument as to why this would cause the instructional error on attempted voluntary manslaughter to "affect the . . . entire jury verdict" is unclear, but in any event it depends on his theory that assault with a deadly weapon is a lesser included offense of

29

attempted voluntary manslaughter.  It is not, for the reasons discussed above in section J.  Appellate

counsel's failure to raise this issue thus was not deficient performance, and Petitioner could not have

been prejudiced by it.

b.    Failure to Raise Double Jeopardy Issue

Petitioner contends that his appellate counsel was ineffective in failing to raise the double

jeopardy issue discussed above in section J.  As concluded there, there was no double jeopardy

violation.  Counsel's failure to raise the issue thus was not deficient performance, nor was Petitioner

prejudiced.

c.    Failure to Request Timely Request Funding for DNA Tests

Petitioner contends that appellate counsel was ineffective in failing to timely request funding

for DNA testing of the box cutter.  There is nothing in the record showing that there was anything to

test on the box cutter, nor that testing would have had any result.  This claim is without merit.

d.    Failure to Argue Prosecutorial Misconduct, Corruption of the Record on

Appeal, or Botched Police Investigation

Petitioner does not specify what prosecutorial misconduct occurred, what he thinks was

wrong with the record on appeal, or what claims regarding the investigation appellate counsel should

have raised.  In the traverse he says as to this issue that there is nothing in the record to show that

counsel conducted a thorough investigation of the law and facts before deciding not to raise the

issues, but that is not the correct standard.  There is a "strong presumption" that counsel rendered

effective assistance, *see Strickland*, 466 U.S. at 689; a Petitioner cannot rebut that strong

presumption with nothing but unsupported conclusions, as Petitioner tries to do.  This claim is

without merit.

e.    Summary

Petitioner has failed to establish that his appellate counsel was ineffective in any of the ways

discussed above.   The rejections of these claims by the state appellate courts thus could not have

been contrary to, or unreasonable applications of, clearly-established United States Supreme Court

authority.

30

14.     Judicial Bias

The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge. *In re Murchison*, 349 U.S. 133, 136 (1955); *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 709 (9th Cir. 1990).   A claim of judicial misconduct by a state judge in the context of federal habeas review does not simply require that the federal court determine whether the state judge committed judicial misconduct; rather, the question is whether the state judge's behavior "rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted).

Petitioner speculates that the sentencing judge may have been related to an assistant district attorney and an attorney for the San Francisco Police Officer's Association because they have the same common last name, Mahoney, but provides no evidence and concedes that he does not know that.  He also contends that various post-trial rulings showed bias.  Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion, *Liteky v. United States*, 510 U.S. 540, 555 (1994), and here Petitioner has failed to show that the rulings were other than routine.

Because Petitioner has failed to show violation of a constitutional right, the rejections of these claims by the state appellate courts thus could not have been contrary to, or unreasonable applications of, clearly-established United States Supreme Court authority.

15.     Motion to Recall Remittitur

Petitioner contends that the California Court of Appeal's denial of his motion to recall the remittitur in his habeas case violated due process.  Errors in the state post-conviction review process are not redressable in a federal habeas corpus proceeding.  *Ortiz v. Stewart*, 149 F.3d 923, 939 (9th Cir. 1998).

16.     Constitutionality of Section 954 of the California Penal Code

Petitioner contends that section 954 of the California Penal Code is unconstitutional.  The section provides:

> An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts,

31

1    and if two or more accusatory pleadings are filed in such cases in the same court, the
     court may order them to be consolidated. The prosecution is not required to elect
2    between the different offenses or counts set forth in the accusatory pleading, but the
     defendant may be convicted of any number of the offenses charged, and each offense
3    of which the defendant is convicted must be stated in the verdict or the finding of the
     court; provided, that the court in which a case is triable, in the interests of justice and
4    for good cause shown, may in its discretion order that the different offenses or counts
     set forth in the accusatory pleading be tried separately or divided into two or more
5    groups and each of said groups tried separately. An acquittal of one or more counts
     shall not be deemed an acquittal of any other count.

6

7    Cal. Penal Code § 954.

8          Petitioner's argument is that the statute permits double jeopardy violations because it allows

9    prosecutors to change multiple offenses involving the same conduct.  As discussed in section K,

10   above, Petitioner errs in assuming that the trial of multiple charges in a single proceeding can trigger

11   federal double jeopardy protections.  *See North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)

12   (double jeopardy Clause bars second prosecution for same offense after conviction or acquittal, or

13   multiple punishments for the same offense).  Because Petitioner has failed to show violation of a

14   constitutional right, the rejections of these claims by the state appellate courts thus could not have

15   been contrary to, or unreasonable applications of, clearly-established United States Supreme Court

16   authority.

17   B.    Certificate of Appealability

18         The federal rules governing habeas cases brought by state prisoners require a district court

19   that enters a final order adverse to a petitioner to grant or deny a certificate of appealability ("COA")

20   in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

21         A petitioner may not appeal a final order in a federal habeas corpus proceeding without first

22   obtaining a COA.  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a COA "only

23   if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

24   2253(c)(2).  The certificate must indicate which issues satisfy this standard.  28 U.S.C. § 2253(c)(3).

25   "Where a district court has rejected the constitutional claims on the merits, the showing required to

26   satisfy § 2253(c) is straightforward: The Petitioner must demonstrate that reasonable jurists would

27   find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

28
                                                    32

1    *McDaniel*, 529 U.S. 473, 484 (2000).

2         This was not a close case.  For the reasons set out above, jurists of reason would not find the

3    result debatable or wrong.  A COA will be denied.  Givens is advised that he may not appeal the

4    denial, but he may ask the court of appeals to issue a COA under Rule 22 of the Federal Rules of

5    Appellate Procedure.  *See* Rule 11(a), Rules Governing § 2254 Cases.

6    C.    <u>Motions</u>

7         Petitioner has filed motions (1) to extend the time to file a case management statement,

8    although there was no case management statement deadline and the Court does not use them in

9    habeas cases; (2) for a temporary stay; (3) to lift the stay, although none had been granted; and (4) to

10   continue the use of ECF (the Court's electronic docket system).  They will be denied as moot.

11                              **V.    <u>CONCLUSION</u>**

12        The petition for writ of habeas corpus is **DENIED** on the merits.  A certificate of

13   appealability is **DENIED**.  Petitioner's motions (documents 98, 100,101 and 102) are **DENIED** as

14   moot.  The Clerk shall close the file.

15

16        IT IS SO ORDERED.

17

18   Dated:  March 14, 2012

19                                    _____

20                                    EDWARD M. CHEN
                                      United States District Judge

21

22

23

24

25

26

27

28
                                      33